[Civ. No. 12771. First Dist., Div. Two. Apr. 6, 1945.]

FRED B. HART, Appellant, v. ADOLFINE OLSON, as Administratrix, etc., Respondent.

Fred B. Hart, in pro. per., for Appellant.

Alfred Nelson for Respondent.

STURTEVANT, J.—Claiming that the defendant's decedent, H. O. Hanson, did by an alleged gift transfer the same to him, one Frederick B. Brown commenced this action to establish his title and to obtain possession of the funds represented by certain bank books contained in a certain safe deposit box. Later the defendant answered. Still later an order was made substituting Fred B. Hart as plaintiff. The action was tried before the court without a jury. The court made findings in favor of the defendant and the plaintiff has appealed and brought up a bill of exceptions. He attacks some of the findings.

Prior to November 9, 1939, the said Frederick B. Brown was a man aged ninety years or over. He resided in the house operated by Mary D. Martin in Oakland. At said time and for some years prior thereto he was an intimate acquaintance of H. O. Hanson. Frequently they exchanged visits. Said Hanson was, and had been for some years, afflicted with a hernia which caused him serious illness at times. He wore a truss but occasionally the intestines protruded through the hernia and caused him excessive pain. On the evening of November 8, 1939, he called on his friend Frederick B. Brown. It was one of his bad days. The hernia was then, and for some hours had been, what is called a strangulated hernia. Hanson remained that night as a guest of Frederick B. Brown. He suffered much pain during the night and planned to go to a hospital the next morning. As the morning approached he made arrangements to carry out that plan. He sent Mr. Brown to purchase some new underwear. While Mr. Brown was absent both Mr. and Mrs. Martin passed the room where Hanson was. Hearing him moaning each entered the room to see if assistance could be rendered. While they were in the room Mr. Brown returned. Taking up the story as told by Mr. Brown on the witness stand it is as follows: ''Hanson soon reached over, took up some keys, handed them to me, saying they were the keys to his safe deposit box, that he gave

me the contents of the box, 'that everything in that box is yours.' I accepted them. Mrs. Martin and her husband left. Hanson was in full possession of his mental faculties and knew what he was doing.'' At about noon on November 9, 1939, Hanson and Brown went to Highland Hospital. Later they moved to Providence Hospital. There they arrived at about 4 p. m. on the same day. At about 8 p. m. Hanson was operated on by Dr. Hodgins and Dr. St. Clair. Basing his claims on said facts Mr. Brown alleged in his complaint: ''IV. That on the 9th day of November, 1939, in contemplation of death, said decedent made a gift of said box and the property represented therein, and delivered the possession thereof, to plaintiff, who accepted the same, and ever since has been and now is the owner of and entitled to the possession of the said property.'' The defendant administratrix denied said allegation and in her amended answer alleged: ''Further answering said complaint this answering defendant alleges that at no time on the 9th day of November, 1939, was said Hilmer Oscar Hanson, deceased, of sound mind and that at no time on said 9th day of November, 1939, was said Hilmer Oscar Hanson mentally competent to know and understand the nature, meaning or quality of a gift and at no time on said 9th day of November, 1939, was said Hilmer Oscar Hanson mentally able to know and understand his natural relation toward the natural objects of his bounty or the extent of his own property.'' The trial court made findings against the plaintiff and in favor of the defendant. The plaintiff contends no one of said findings was supported by the evidence. We think he is mistaken as to each of those claims. The attack on what was said in the conversation in Mr. Brown's room by Mr. Hanson, and the legal effect of those words under the allegation that he was then not of a sound and disposing mind, present two entirely different legal propositions. We will discuss them in the order stated.

██ The plaintiff quotes the testimony hereinabove set forth given by Mr. Brown and the testimony given by both Mr. and Mrs. Martin, and thereupon he asserts: ''Here the facts are undisputed.'' However, he omits many circumstances, the evidence of which was adduced at the trial, and which the trier of the facts was entitled to use in weighing the testimony. Some of those circumstances were the following. On November 14th, Mr. Ober, a deputy county treasurer

of Alameda County, by appointment met Mr. Bryant, deputy public administrator, Mr. Frederick B. Brown, Mr. P. A. Rothrock (Mr. Brown's attorney), and a representative of the Bank of America, at the safe deposit vault and at that time and place Mr. Ober borrowed the keys in the possession of Mr. Brown and opened the box. As Mr. Ober testified: "In it I found a deed, a statement from Gotsborg Bank of Sweden showing Mr. Hanson had on deposit in that bank 38,283.57 kroner, pass book No. 21,921 of Central Bank representing a deposit of $2034 in the name of Hilmer O. Hanson, one Y M watch and chain, a will and other papers of no value. Mr. Brown had, besides this, in his possession but not in the box, a pass book showing a deposit of $340 in some bank." The will mentioned by the witness was introduced in evidence. It was a formal holographic will written on three pages. It was written and dated at Oakland, September 5, 1935, and named Salem Lutheran Home as executor. It specified decedent's deposits and named Central Bank of Oakland, Bank of America, San Francisco Bank, Aktichbrolaget Gote Bank and Gothenburg Bank as the banks of deposit. It provided $300 for funeral expenses and $700 for a vault in the mausoleum, El Cerrito, Contra Costa County. It left a fund of $4,000 to Salem Lutheran Home to care for Adolfine Olson, and it left the moneys deposited in Aktichbrolaget Gote Bank to the daughters of decedent's niece but made no other bequests.

Turning back to the testimony given by Mr. Brown, it is patent that the same was ambiguous. It was so brief as not to indicate fully and completely the intention of the donor. In other words, assume that Mr. Hanson stated the will was given to Mr. Brown, the question at once arises for what purpose, to enable the latter to probate it, to destroy it, or what? There was not a word contained in the statement of the decedent that he was dissatisfied with the will in any respect whatsoever. In passing it should be noticed that the plaintiff contends the estate amounted to $15,000. The record does not show that fact. The will mentions kroners. The plaintiff says the value of a kroner is equivalent to $.268 of our money. The record does not show that fact, nor does it show the value as of the date of making the will or as of any other date.

Both Mrs. Martin and Mr. Martin delineated the statements made by the decedent Hanson in almost the same words used

by the witness Brown. However, Mr. Martin made the statement, "He (the decedent) looked like he was about dead." Both Mrs. Martin and Mr. Martin testified that they never discussed with Mr. Brown what Hanson had said. Mr. Brown testified he had never discussed with Mr. and Mrs. Martin what Hanson had said. Bearing in mind that Mr. Brown was a roomer in the household of Mr. and Mrs. Martin, had been for a number of years, and continued as such roomer for a number of months after the death of Mr. Hanson, all of those statements were highly improbable.

Looking back at the testimony given by Mr. Ober, there were in the box "other papers of no value." At Highland Hospital, Mr. Brown testified, "He wanted me to take possession of the contents of his pockets and the hospital attendant searched his clothes, put the contents of his pockets in a bag and gave it to me. These consisted of a bank book showing a deposit of $340 and some papers. Hanson told me that that money was to be used to pay his expenses at the hospital and of sickness. I brought them back to my room when I left him and later gave the bank book to the public administrator, some of the papers to Stout (the undertaker) and destroyed the rest, I suppose, as they were worthless. I don't remember what became of them." No witness gave any evidence regarding any of said "papers," nor the contents of any one of them.

Mr. Hubert D. Bryant, the deputy public administrator, testified: "When we went there (to the safe deposit vault) Brown told me Hanson had left him property. If my recollection is right he told me Hanson told him if anything happened to him to go to the bank and get the Swedish money." As such facts are of the utmost importance to a public administrator the trial court might well assume that Mr. Bryant carefully repeated the statements made to him.

Mr. Bergsten was in charge of the office at the Salem Home. He testified that he called on Mr. Brown, that the latter told him about opening the box and that they found a will and some of the money. Continuing, the witness testified: "Now Mr. Brown said that when Hanson was brought to the hospital he had need of some money and for him to take the keys and get that in case he had any payments to be made. He said when they opened the box he thought Mr. Hanson had left something for him, that he did not find anything and that

he would like to be reimbursed to the extent of $50 for things he had done.'' That statement contained a clear implication that Hanson turned over the keys to Mr. Brown for the sole purpose of allowing the latter to get moneys needed for immediate use. It also contained the implication that Mr. Brown was claiming the right to be reimbursed for services rendered, and was not at that time claiming a gift had been made to him by Hanson.

True it is that Mr. Brown took the stand and denied that he made the statements testified to by Mr. Bryant and those testified to by Mr. Bergsten. However, that merely created a conflict and did not preclude the trial court from inquiring into the true facts presented by all of the circumstances surrounding the alleged gift. The trial court was bound to receive with caution all such evidence. (*Mutual Benefit Life Ins. Co.* v. *Clark*, 81 Cal.App. 546 [254 P. 306]; *O'Shea* v. *Sicotte*, 52 Cal.App. 331, 334 [198 P.812]; *Estate of Reinicke*, 44 Cal.App.2d 271, 277 [112 P.2d 311]; *Brooks* v. *Whitman*, 122 Cal.App. 660 [10 P.2d 1007].) Apparently, it did so. Some of that evidence it believed and some it rejected and made findings accordingly. Such findings are conclusive in this court.

 Giving effect to all these circumstances it may not be said that the trial court erred in finding that the words used by Hanson did not constitute a gift of any bank deposit.

The plaintiff also attacks the findings that the decedent was of unsound mind at the time the purported gift was made. On pages 29 to 31 he recites facts claimed to be circumstances to be considered as proved. Many of said facts do not appear in the record. The plaintiff attacks the opinion of Mrs. Olson as not being worthy of consideration because she did not see her brother, Mr. Hanson, frequently. The record is clear that Mr. Hanson resided in Oakland and that Mrs. Olson resided in San Francisco. It is also clear that their relations were not unfriendly. How often they saw each other does not appear. However, the plaintiff argues that Mrs. Olson was not an intimate acquaintance. (Code Civ. Proc., § 1870, subd. 10.) In the trial court the plaintiff made no objection to that effect and the trial court was not asked to rule on the point, therefore the point may not be made in this court for the first time. (2 Cal.Jur. 234.) Furthermore, the trial court has a wide discretion in determining who

are intimate acquaintances (Code Civ. Proc., § 1870, subd. 10) and its ruling will not be disturbed in the absence of a showing of a clear abuse of discretion. (*Estate of McKenna,* 143 Cal. 580, 583 [77 P. 461].) In *Dunphy* v. *Dunphy,* 161 Cal. 380 [119 P. 512, Ann.Cas. 1913B 1230, 38 L.R.A.N.S. 818], the same contentions were made which this plaintiff makes. On page 385 the court said:

''In support of the allegations of the complaint, a number of witnesses, having first qualified as intimate acquaintances of Dunphy, expressed the opinion that he was of unsound mind. In accordance with the provision of the Code of Civil Procedure (sec. 1870, subd. 10) each of these witnesses gave 'the reason for the opinion.' The appellant undertakes to analyze the various reasons so given, and argues that they are not adequate to justify the conclusion drawn from them. Reliance is placed upon *Estate of Dolbeer,* 149 Cal. 227 [86 P. 695, 9 Ann.Cas. 795], where it was said that the opinion of an intimate acquaintance respecting the mental sanity of a person 'can have no weight other than that which the reasons' (upon which it is based) 'bring to its support.' We do not understand this to mean that the appellate court is to put itself in the position of the trial court, and, from an examination of the reasons assigned, determine as an original question whether the opinion of the witness is to be given any weight or is to be rejected.'' (See, also, 14 Cal.Jur. 372, Insane Persons, § 25.)

The plaintiff also attacks the testimony given by Dr. Hodgins and Dr. St. Clair. The former was, and had been for some years, the doctor for the decedent. When the decedent was taken to the hospital Dr. Hodgins went to his assistance. Later in the day he called in Dr. St. Clair. About 8 o'clock in the evening Dr. St. Clair operated on Hanson and Dr. Hodgins administered the anesthetic. Basing their testimony on what they had observed, both testified that Hanson was of unsound mind when he entered the hospital and had been for some time previous thereto. As each witness based his opinion on what he had *observed* it was not necessary that either should state the facts on which he based his opinion before expressing it. (10 Cal.Jur. 970; 22 C.J. 527.) They both testified that Hanson was senile, that the rupture had been strangulated three or four days, that such strangulation produced intense pain and that Hanson's con-

stitution was so affected that he could not be said to be of sound mind.

█ The defendant also called Dr. Smith and Dr. Slavich as experts. To each a hypothetical question was addressed. In reply each witness testified that Hanson was of unsound mind at the time the alleged gift was made. The plaintiff now contends that the hypothetical question contained recitals not shown to have been elicited as evidence in the case. However, an examination of the record discloses no objection of that kind was made in the trial court and it is settled law that such a contention may not be made in this court for the first time. (*Holland* v. *Kelly*, 74 Cal.App. 576, 579 [241 P. 579].)

█ The plaintiff called some witnesses who gave testimony to the effect that although Hanson was suffering from a strangulated hernia, nevertheless he was of sound mind. That testimony created a conflict, but the conflict was addressed to the trier of the facts and not to this court.

The judgment is affirmed.

Nourse, P. J., and Goodell, J., concurred.

A petition for a rehearing was denied May 5, 1945, and appellant's petition for a hearing by the Supreme Court was denied May 31, 1945.