Filed 12/16/13  Hedren v. Allen CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TIPPI HEDREN, | D061186 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. 37-2009-00095599-CU-NP-CTL) |
| JOSEPH D. ALLEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, William S. Dato, Judge.  Affirmed.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Bartley L. Becker and Allison A. Arabian for the Defendant and Appellant.

Greene, Broillet & Wheeler and Bruce A. Broillet, Geoffrey S. Wells and Alan Van Gelder; Esner, Chang & Boyer and Stuart B. Esner, Andrew N. Chang and Holly N. Boyer for the Plaintiff and Respondent.

In this legal malpractice action, defendant Joseph D. Allen, who represented plaintiff Tippi Hedren in the underlying personal injury action, appeals from a judgment on a jury verdict in favor of Hedren. The judgment awards Hedren damages that the jury found she would have recovered in the underlying action but for Allen's negligence in dismissing the action without obtaining a stipulation from the defendants to toll the statute of limitations. In the underlying action, Hedren alleged that as a result of the negligence of the owners of a sound stage where she was rehearsing and filming a scene for a motion picture, a gallon of water fell on her head and caused the return of a chronic headache condition that had been successfully treated.

Allen contends that (1) the court erred in refusing to give jury instructions on superseding causation and contributory negligence; (2) Hedren's medical expert provided no reasoned basis for his opinion that the subject accident caused Hedren's headaches to return; (3) the court erred in admitting speculative expert testimony concerning lost future earnings and earning capacity; (4) because there was no competent evidence of lost future earnings or earning capacity, the court erred in instructing the jury that it could award such damages; and (5) the jury's total award of damages is excessive as a matter of law. Allen contends that each of the court's errors standing alone requires reversal of the judgment and remand for a new trial. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Hedren's Career*

Hedren was born in Minnesota in 1930. She moved to the Los Angeles area with her parents when she was 17 and finished high school there. After studying arts at

Pasadena City College for one year, she moved to New York and pursued a successful modeling career. When television became prevalent, she appeared in numerous television commercials. In 1961, Alfred Hitchcock discovered her in a television commercial and cast her in a starring role in his movie *The Birds.* Because she had no previous acting training, Hitchcock became her drama coach as well as her director. She received a Golden Globe award for the most promising actress of 1961 for her role in *The Birds.* After *The Birds,* Hitchcock cast Hedren in the leading role in the movie *Marnie*. Hedren continued to have a successful acting career and has appeared in numerous feature films and television shows over the years.

After working on two films in Africa and 1969 and 1970, Hedren became interested in wildlife preservation and founded Shambala, a preserve in Southern California for big cats born in captivity. In 1983 she founded a nonprofit organization named the Roar Foundation to accept donations for Shambala. Hedren served as Shambala's president and worked to raise money for Shambala through the Roar Foundation while continuing to pursue her acting career.

*Hedren's History of Headaches*

Hedren began experiencing severe and persistent severe headaches in the mid-1990's. In 2000, she sought treatment for them from Dr. Thomas Hopkins, an orthopedic surgeon, who referred her to Dr. Lancelot Alexander, a neurologist. Dr. Alexander prescribed medication for tension headache disorder, but Hedren's headaches continued to progress.

3

Hedren's medical expert at trial was Dr. Nicholas Fuller, an anesthesiologist who specializes in spinal pain management. Dr. Fuller testified that after Hedren saw Dr. Alexander, she "continued to follow up with Dr. Hopkins." According to Dr. Fuller, at some unspecified time Hedren went back to Dr. Alexander, who then concluded she suffered from cervicogenic headaches. After Dr. Alexander prescribed "multiple medication trials" that failed, he sent Hedren back to Dr. Hopkins, who at that point considered treating her headaches with surgery.

In 2005, Dr. Hopkins referred Hedren to Dr. Fuller, who noted in a written report to Dr. Hopkins that Hedren's headache condition had been successfully treated with "bilateral C4-C5 and C5-C6 foraminal [nerve root block] injections approximately three years ago." Dr. Fuller presumably was referring to injections that his colleague Dr. Randy Rosen performed in 2002 with Dr. Fuller serving as anesthesiologist. In his report dated May 13, 2005, Dr. Fuller diagnosed Hedren's headaches as cervicogenic and indicated that repeat nerve root block injections had been performed that day.

After Hedren went through multiple spinal interventions and medication trials that were unsuccessful in treating her headaches, Dr. Hopkins decided the potential benefits of spinal surgery outweighed the risks. On April 10, 2006, he performed spinal fusion surgery on Hedren. The surgery involved immobilizing her C4 through C7 neck vertebrae by attaching a titanium plate to them with screws, causing the vertebrae to fuse over time. Hedren testified that the surgery resulted in immediate relief from her headache pain and was a miracle to her. She was free of headaches at a follow-up visit in

4

May 2006, and a CT scan was scheduled for August to ensure that her spine was fusing properly. Dr. Hopkins advised her not to work for two or three months after the surgery.

*The Accident and Ensuing Injury*

Shortly after her surgery, Hedren accepted a role in the television show *Fashion House*. Dr. Hopkins approved her taking the role because it was not an action picture and she would be playing a woman who was dying of cancer and used a walker. On June 22, 2006, Hedren was rehearsing and filming a scene for *Fashion House* at Stu Segal Studios in San Diego. She was wearing a nightgown and slippers and was using a walker for the scene. She noticed that water was dripping from the ceiling onto a carpeted area and that the carpet was soaked. As she was rehearsing the scene approximately ten feet away from the wet carpet, about a gallon of water fell from the ceiling onto her head. The water was traveling at a speed of about 25 miles per hour when it struck Hedren, who testified that it "felt like part of the ceiling had dropped on my head." She had to hold onto her walker to maintain her balance and avoid falling. She described the experience as a "terrible shock." The water that fell on her had accumulated on a plastic tarp under the sound stage's plywood roof, possibly because a bird's nest was blocking a condensation tube in the air conditioning system.

Immediately after the accident, Hedren wanted to continue working. However, at the insistence of her coworkers and the advice of a doctor on the set, she went to a nearby hospital for an x-ray. After being x-rayed at the hospital, Hedren returned to work. That night her headache returned. She worked over thirteen hours the following day, which was a Friday, and continued to suffer a headache that day and throughout the weekend.

5

On June 26, 2006, she underwent a CT scan that Dr. Hopkins prescribed to determine whether there was a problem with the spinal fusion he had performed. The scan showed the fusion was good and the fusion site was not the source of Hedren's headache pain. Dr. Hopkins told Hedren that he could not perform additional surgery on her to address her headaches.

Hedren tried various treatments for her chronic headache pain after the accident, including chiropractic, acupuncture, physical therapy, medications, botox injections, and nerve block injections. She testified at trial, however, that she had continuously suffered headaches since the accident in June 2006.

*The Underlying Lawsuit*

In October of 2006, Hedren retained Allen to file a personal injury lawsuit against the owner and lessee of the sound stage where the accident occurred based on their alleged negligence in failing to properly maintain the roof.[1] Allen filed the complaint on behalf of Hedren in March of 2007. Shortly before the trial readiness conference in the case, Allen dismissed the lawsuit without prejudice without first obtaining an agreement from the defendants to toll the statute of limitations. When Allen refiled the action about

---

[1] Hedren and Allen stipulated that Corrigan Limited Partnership owned the sound stage property and Stu Segall Productions leased the property. Kirkwood Productions (Kirkwood) was the company that employed Hedren and rented the soundstage from Stu Segall Productions to film scenes for *Fashion House*. Allen's opening brief on appeal and Hedren's opening statement at trial reflect that Kirkwood Productions was named as a defendant in the underlying action. Although it is not clear from the record, Allen's opening brief and Hedren's opening statement at trial indicate that Allen dismissed Kirkwood from the underlying action before he voluntarily dismissed the entire complaint without prejudice with the intent of refiling it.

a month later, the defendants filed a demurrer to the new complaint on the ground it was barred by the statute of limitations. The trial court sustained the demurrer without leave to amend and dismissed the action in October 2009.

*The Present Malpractice Lawsuit*

Hedren filed the present malpractice action against Allen in August 2009, seeking to recover against Allen "the damages that she reasonably could have expected to have recovered in the underlying lawsuit . . . , including but not limited to general damages for pain, suffering, emotional distress, medical expenses past and future, lost earnings, lost earnings capacity, past and future." At trial Allen conceded he was negligent in dismissing the underlying action without a tolling agreement. Consequently, the trial essentially involved trying the underlying case to determine what Hedren reasonably could have expected to recover but for Allen's negligence.[2] The jury returned a verdict awarding Hedren total damages in the amount of $1,483,708, consisting of $213,400 for past lost earnings; $170,000 for future medical expenses; $440,308 for future lost earnings and lost earning capacity; $300,000 for past noneconomic loss, including physical pain and mental suffering; and $360,000 for future noneconomic loss, including

_____

[2]    " '[A] client claiming that his [her] attorney was negligent in connection with litigation has the burden of proving that damages resulted, this burden involving, usually, the difficult task of demonstrating that, but for the negligence complained of, the client would have been successful in the prosecution or defense of the action in question.' [Citation.] 'Thus the issue of liability includes not only a showing the attorney was negligent but also a showing his [or her] negligence caused damage.' " (*Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 744.) Essentially, the plaintiff must try or retry the underlying action in the malpractice trial. (*Ibid.*)

7

physical pain and mental suffering. The court entered judgment on the verdict and denied Allen's subsequent motion for new trial.

DISCUSSION

I. *Refusal to Instruct on Superseding Causation*

Allen contends the court committed reversible error by rejecting his proposed special instruction on superseding causation. The proposed special instruction, entitled "Independent Intervening Act," stated: "Where after a defendant's alleged wrongful act or omission there occurs an independent intervening act or event which is not foreseeable, or is otherwise extraordinary or not reasonably likely to occur, the alleged act or omission of the defendant is not the legal cause of plaintiff's alleged damage." The court rejected the proposed instruction on the ground there was no evidentiary basis for an "intervening cause" instruction.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule* v. *General Motors Corp.* (1994) 8 Cal.4th 548, 572.) In considering whether the trial court erred in refusing a instruction, we view the evidence in the light most favorable to the applicability of the instruction because a party is entitled to a requested instruction if the evidence could establish the elements of the theory it presents. (*Chanda v. Federal Home Loans Corporation* (2013) 215 Cal.App.4th 746, 755.) However, instructional error in a civil case is not ground for reversal unless it seems reasonably probable that the error

prejudicially affected the verdict. (*Soule*, at p. 580; *Chanda*, at p. 755.) In determining whether instructional error was prejudicial, a reviewing court evaluates "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, at pp. 580-581, fn. omitted.)

"[T]he defense of 'superseding cause[]' . . . absolves a tortfeasor, even though his conduct *was* a substantial contributing factor [to the plaintiff's injury], when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible." (*Soule*, *supra*, 8 Cal.4th at p. 573, fn. 9.) "[T]he fact that an intervening act of a third person is done in a negligent manner does not make it a superseding cause if a reasonable [person] . . . would not regard it as highly extraordinary that the third person so acted or the act is a normal response to a situation created by the defendant's conduct and the manner in which the intervening act is done is not extraordinarily negligent." (*Stewart v. Cox* (1961) 55 Cal.2d 857, 864.) In other words, for third party negligence to constitute a superseding cause of an injury, the third party's negligence must be "so highly extraordinary as to be unforeseeable." (*Torres v. Xomox Corp.* (1996) 49 Cal.App.4th 1, 18-19.)[3]

---

3    CACI No. 432 entitled, "Affirmative Defense—Causation: Third-Party Conduct as Superseding Cause" articulates the legal requirements of that defense as follows: "[Defendant] claims that [he] is not responsible for [plaintiff]'s harm because of the later misconduct of [a third party]. To avoid legal responsibility for the harm, [defendant] must prove all of the following: [¶] 1. That [the third party]'s conduct occurred after the

9

Allen contends the superseding cause of Hedren's injury that absolved the underlying defendants of liability was the negligence of Hedren's employer Kirkwood in failing to do anything about the water dripping onto the sound stage on a day with no rain and directing Hedren and other employees to work as usual. Allen argues that a reasonable person could find Kirkwood's conduct was highly unusual or extraordinary. We disagree. Water dripping onto a floor from a ceiling or roof would not ordinarily cause a reasonable person who does not own or control the premises to expect that a large deluge of water falling from the ceiling is imminent or even likely to occur. A person might reasonably surmise from such dripping that the roof or an air conditioning unit is leaking, but there is no evidence in the record of any circumstance that should have put the employees of Kirkwood on notice that a large amount of water had accumulated above the plastic tarp covering the roof and was likely to suddenly burst through the tarp above and fall onto the stage below. Accordingly, Kirkwood's continuing to rehearse and film scenes on the sound stage despite the dripping water did not constitute conduct that was so highly extraordinary as to be unforeseeable. Using the language of CACI No. 432, we conclude a reasonable person would not consider Kirkwood's continuing to use the sound stage despite the dripping water as a highly unusual or an extraordinary response to the situation. The trial court reasonably refused to instruct the jury on

conduct of [defendant]; [¶] 2. That a reasonable person would consider [the third party]'s conduct as a highly unusual or an extraordinary response to the situation; [¶] 3. That [defendant] did not know and had no reason to expect that [the third party] would act in a [negligent/wrongful] manner; and [¶] 4. That the kind of harm resulting from [the third party]'s conduct was different from the kind of harm that could have been reasonably expected from [the defendant]'s conduct."

superseding causation on the ground there was no evidentiary basis for such an instruction.

## II. *Refusal to Instruct on Comparative Fault*

Allen contends the court prejudicially erred by refusing to instruct the jury with the following modified version of CACI No. 405 regarding comparative fault: "Joseph Allen claims that Tippi Hedren's own negligence contributed to her harm. To succeed on this claim, Joseph Allen must prove both of the following: [¶] 1. That Tippi Hedren was negligent; and [¶] 2. That Tippi Hedren's negligence was a substantial factor in causing her harm. [¶] If Joseph Allen proves the above, Tippi Hedren's damages are reduced by your determination of the percentage of Tippi Hedren's responsibility. I will calculate the actual reduction." The court refused this instruction on the ground there was insufficient evidence to warrant it.

Allen contends the comparative fault instruction was warranted because there was evidence that Hedren was standing on the rug where the ceiling was leaking just before the accidentand that she performed two "stage falls" on the day of the accident even though Dr. Hopkins had instructed her not to fall. Allen further argues the comparative fault instruction was warranted because there was evidence that Hedren did not see Dr. Hopkins until 55 days after the accident; she fell on her elbows and shoulders in 2010; and she continued campaigning for Shambala at "a hectic pace" even though Dr. Hopkins told her to slow down after her spinal fusion surgery.

We conclude the court correctly decided there was insufficient evidence to warrant an instruction on comparative fault. The portions of the reporter's transcript that Allen

11

cites as evidence that Hedren was standing on the rug where the ceiling was leaking *before the accident* does not establish that she was standing on that spot *at the time of the accident*. In any event, the evidence does not establish that the water that fell onto Hedren broke through the plastic tarp covering the ceiling at the same place from which the water was dripping before the accident. Hedren's accident reconstruction expert testified that the location where the water was dripping onto the stage may not have been the same location where Hedren was struck by the falling water. Even if there were sufficient evidence to support a finding that Hedren was standing beneath the dripping water at the time of the accident, it would not warrant a comparative fault instruction because a reasonable person exercising due care would not reasonably foresee that standing under a ceiling leak is likely to result in being struck by a sudden release of a gallon of water from the ceiling.

The fact that Hedren executed two "stage falls" on the day of the accident is not evidence of contributory negligence because the stage falls were not actual falls and there was no evidence that they caused any injury to Hedren.[4] (*Williams v. Wraxall* (1995) 33 Cal.App.4th 120, 132 [causation requires proof that the conduct in question was a substantial factor in bringing about the plaintiff's harm].) Nor is there any evidence that

---

[4]  Hedren testified that a stage fall or "actor's fall" is performed in way that "you do not hurt yourself." She explained: "It's how an actor prepares to do an action, that even though it could be harmful, the way that you fall, you do not hurt yourself. And they had a pad down there for me that was about that thick that I would eventually land on. But how you do it is you fall and I braced my hand on the table, I braced my hand on the bottom of the chair and they rolled over. I am not interested in getting hurt in any way. I'm not a stunt woman, but they showed me how to do it and it was very successful."

Hedren's waiting 55 days to see Dr. Hopkins contributed to her injury. Dr. Hopkins ordered a CT scan of her cervical region a few days after the accident, and he reviewed the scan and reported the results to Hedren. There was no evidence that Hedren's actually seeing Dr. Hopkins sooner than she did after the accident would have lessened her injury. Likewise, there was no evidence that Hedren's fall on her elbows and shoulders in 2010, *approximately four years after the accident*, contributed to the chronic headache condition that had been ongoing since the accident.

Finally, the evidence of Hedren's travel and activities following the accident did not warrant a comparative fault instruction. Allen's assertion that Hedren campaigned for Shambala at a "hectic pace" after the accident despite Dr. Hopkins's advising her to "slow down" is more argumentative than evidentiary. The evidence does not show that Dr. Hopkins told Hedren to "slow down" in a follow up visit from her *April* 2006 spinal fusion surgery, as Allen suggests in his opening brief. The medical record that Allen cites as supporting that suggestion contains the following statement by Dr. Hopkins in a report dated *September* 14, 2006: "We have stressed that she needs to stay off planes and in town for a minimum of three months *post-injection* in hopes of decrease in her symptom complex and precluding surgical intervention." (Italics added.) Thus, Dr. Hopkins advised Hedren, in so many words, to "slow down" after *future* injections she would undergo in the hope of avoiding additional surgery.[5] The evidence that Allen cites

---

[5]     Dr. Fuller testified that Dr. Hopkins referred Hedren to him in August 2006 and he (Dr. Fuller) performed cervical facet injections on her in September or October 2006.

13

as showing Hedren ignored that advice includes her testimony about a trip she took to Africa in the *summer* of 2006, before Dr. Hopkins advised her to stay off airplanes, and her testimony that she traveled to Chicago in October 2006 for an autograph convention and attended autograph sessions in England, New Jersey, Florida, Chicago, and Oregon in 2010 – three to four years after Dr. Hopkins advised her to stay off planes and in town for a minimum of three months post injection. To the extent Hedren's October 2006 flight was contrary to Dr. Hopkins's advice, it did not warrant a comparative fault instruction because there was no evidence that it contributed to her injury.

Thus, the court did not err in deciding there was insufficient evidence to warrant an instruction on comparative fault. Even if we were to conclude there was sufficient evidence to warrant the comparative fault instruction, we would find the court's refusal of the instruction was harmless error because it is not reasonably probable that the jury would have found that Hedren was negligent on the day of the accident, or that any of her post-accident conduct that Allen cites as supporting the instruction was a substantial factor in causing the harm she suffered.

### III. *Expert Testimony On Causation*

At trial, Hedren's medical expert, Dr. Fuller, testified that the subject accident caused the return of Hedren's chronic headache condition.[6] Allen contends that Dr.

---

[6] Hedren's counsel asked Dr. Fuller if he was "able to form an opinion as to whether the incident of June 22, 2006 with the water on the set was, to a reasonable medical certainty, the cause of [Hedren's] headaches coming back?" He answered: "I do believe there's a direct causation regarding the water that fell on [Hedren] recreating her cervicogenic headache."

14

Fuller offered no foundation for that opinion and, therefore, Hedren failed to prove to a reasonable medical probability that the subject accident caused the damages she claimed.[7]

In reviewing a challenge to the sufficiency of the evidence to support a jury verdict, we construe the evidence as favorably as possible in support of the verdict. (*Ogulin v.* Jeffries (1953) 121 Cal.App.2d 211, *Kasperian v. County of Los Angeles* (1995) 38 Cal.App.4th 242, 259.)  "The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony.  Mere possibility alone is insufficient to establish a prima facie case." (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402.)  "There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease.  A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action."  (*Id.* at p. 403, italics added.)

Allen cites the rule that " '[w]here an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value.  [Citations.]  In those

_____

[7]     Allen does not contend on appeal that the insufficiency of Dr. Fuller's testimony to prove causation in the underlying action requires judgment in his favor, and he did not move for judgment notwithstanding the verdict.  Rather, he contends that because Dr. Fuller's causation opinion lacks foundation, there is no substantial evidence to support the jury's large award of noneconomic damages.

15

circumstances the expert's opinion cannot rise to the dignity of substantial evidence.' " (*Borger v. Department of Motor Vehicles* (2011) 192 Cal.App.4th 1118, 1122 (*Borger*), quoting *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135 (*Zuckerman*.)

*Borger* and *Zuckerman* support the proposition that to have evidentiary value, an expert's opinion must be based on matters that are reasonably relied upon by an expert in forming an opinion on the subject in question, are not precluded by law from consideration, and do not otherwise constitute an improper basis for an opinion. (Evid. Code, §§ 801-803.) They do support the proposition that an expert must in every case provide a detailed explanation for an opinion. To the contrary, "[w]here an expert witness, such as a medical witness, bases his scientific opinion on his observation, such as an attending or treating physician observing his patient, he need not state the reasons for his opinion—the facts upon which they are based—to render his opinion competent and probative evidence." (*Lumbermen's v. Mut. Cas. Co. v. Ind. Acc. Com.* (1946) 29 Cal.2d 492, 500 (*Lumbermen's*); *People v. Mendibles* (1988) 199 Cal.App.3d 1277, 1293 [an expert medical witness is qualified to give an opinion of the cause of a particular injury on the basis of the expert's deduction from the appearance of the injury itself]; *Hart v. Olson* (1945) 68 Cal.App.2d 657, 664 [when a medical expert's opinion is based on what the expert has *observed* it is not necessary that the expert state the facts on which he or she based the opinion].) When a treating physician renders an expert opinion, "it may be assumed [he or she] made observations and acquired sufficient facts as a basis for [the opinion]." (*Lumbermen's*, *supra*, 29 Cal.2d at p. 501.)

Here, Hedren's medical expert Dr. Fuller was one of her treating physicians before and after the accident. As such, he observed her condition in 2005 before her fusion surgery. In August 2006, Dr. Hopkins referred Hedren to Dr. Fuller for cervical facet injections "in an attempt to diagnose and treat [her] persistent headache[,]" and Dr. Fuller performed the injections in September or October of 2006, after the subject accident but before Hedren filed the underlying action. In 2008, Dr. Fuller participated as the anesthesiologist for a diagnostic surgery performed on Hedren known as a discogram.[8] Because Dr. Fuller rendered an expert opinion about a medical problem he had been involved in treating, it may be assumed that he made observations and acquired sufficient facts as a basis for his opinion. (*Lumbermen's*, *supra*, 29 Cal.2d at p. 501.)

Dr. Fuller explained to the jury that a "pain generator" for a headache is "the structure that is eliciting the patient's pain" and that problems in the neck can generate a headache because the "fifth cranial nerve provides facial sensation, [and] it also has some of its motor neurons in the upper cervical spine." Based in part on his treatment and observation of Hedren in August 2006, he testified that the pain generator or *source* of her headache pain was her upper cervical region, and that *cause* of the pain was "related to the water falling upon her." Given Dr. Fuller's testimony as an expert witness and

8    Dr. Fuller explained that a discogram is a diagnostic surgery "where you insert a needle as close as possible interpreting the pain signals. Once you pressurize those discs, a normal, healthy disc will be painless. Very similar to a jelly donut, all the jelly will stay inside the donut. A cracked disc you'll see the contrast agent go through one of the cracks where the jelly would leak out. And more likely and more often than not that's associated with severe pain which, unfortunately, Tippi had to endure. She recorded predominant pain."

17

treating physician who had observed Hedren's condition before and after the accident, and the evidence that a gallon of water traveling at a speed of 25 miles per hour fell onto Hedren and felt to her "like part of the ceiling had dropped on [her] head," the jury could reasonably find that the trauma of the water striking Hedren caused pain to be generated from the neck vertebrae above her surgically fused vertebrae and resulted in the recurrence of her chronic headaches.

When a treating physician renders an expert opinion about a medical condition based on his or her observation of the patient and does not expressly articulate the facts upon which the opinion is based, it is appropriate to look to cross-examination to inform the jury of any weakness in the foundation for the expert's opinion. (*Lumbermen's*, *supra*, 29 Cal.2d at pp. 500-501.) Although Allen's counsel extensively cross-examined Dr. Fuller, he never asked Dr. Fuller to explain the basis for his opinion that the water-falling accident caused Hedren's current chronic headache condition. As the *Lumbermen's* court stated regarding an expert opinion's report on the cause of an injury in the context of proceedings before the Industrial Accident Commission (predecessor to the Workers Compensation Appeals Board),[9] "[t]he failure of the report to state the reason for the expert opinion does not strip it of probative value to the point where it is not substantial evidence supporting the decision of the commission. It goes to the weight of such evidence, a matter within the exclusive province of the commission as the arbiter of

---

[9]     See *Sampson v. Parking Service 2000 Com, Inc.* (2004) 117 Cal.App.4th 212, 225.

18

fact. Petitioners had the right to cross-examine the witnesses if they saw fit." (*Lumbermen's*, at p. 500.)

Similarly, Dr. Fuller's failure to explain (because he was never asked to explain) the physical mechanism by which the water-falling accident caused the return of Hedren's headaches does not completely strip his causation opinion of probative value to the point that it is not substantial evidence supporting the jury's causation finding. Bearing in mind that we must we construe the evidence as favorably as possible in support of the verdict, we conclude that Dr. Fuller's causation opinion, viewed in context of the entire record, sufficiently supports the jury's determination that the subject accident caused the return of Hedren's chronic headache condition.

IV. *Expert Testimony on Future Lost Earnings and Earning Capacity*

Allen contends the court erred in admitting speculative expert testimony concerning lost future earnings and earning capacity. He further contends that because there was no competent evidence of lost future earnings or earning capacity, the court erred in instructing the jury that it could award such damages.

At trial, Hedren's talent agent Carlyne Grager testified as an expert witness about Hedren's damages for future lost earnings. Grager testified that her talent agency specializes in obtaining work for "legends"—i.e., senior citizen actors "who are names, who have been stars"—and that the market for such actors in Hollywood had grown substantially in the last few years and would continue for the next ten years. She has clients who work into their 90's, including Carol Channing. Grager testified that there is demand for Hedren in Hollywood and that "it's daily we're getting inquiries for her

19

services."  Hedren's publicist referred Hedren to Grager because Grager was "strong on marketing," and it was "crucial to [Hedren's] career to be able to work within the next 10 to 15 years, that immediately she get an agent who understands and recognizes the need to build up her fan base, regenerate her audiences, [and] make people aware that she was a viable dynamic entity with all of the functions and skill set to be able to play upcoming roles."

In 2011, the year the trial was held, Hedren played a role in a feature film starring Jessie Eisenberg and Jason Ritter and completed a film entitled *Jane Mansfield's Car* produced by Billy Bob Thornton and starring Dennis Quade, Kevin Bacon, and John Hurt who played the husband of Hedren's character.  At the time of trial, there were three or four films in preproduction in which Hedren had been offered starring roles.  She had also been offered a part in a television series produced by and starring Betty White. Grager testified that Hedren's headache condition would cause Hedren to lose a minimum of 30 days of television acting work per year that would pay a minimum of $2,500 and up to $10,000 to $20,000 per day.

Based on Grager's testimony, Hedren's economist expert Peter Formuzis, testified regarding the amount of Hedren's past and future economic losses.  In calculating Hedren's annual lost income, Formuzis used the reduced figure of $2,000 per day as the amount Hedren would be paid for television work and assumed Hedren would continue to work eight and a half more years until she reached the age of 90.  Multiplying daily pay of $2,000 times 30 days of lost television work per year and subtracting a ten percent agent fee from the resulting figure of $60,000, Formuzis testified that Hedren's past lost

20

earnings were $275,850 and her future lost earnings, reduced to present value, were $440,308.

Allen contends the court should have excluded Formuzis's testimony as speculative because it was based entirely on Grager's opinions that plaintiff would have been working 30 more days per year in television but for her injury[10] and will work until she reaches the age of 90. Allen complains that Grager has no expertise in medicine or disability, and that there was no basis for using television work as a basis for determining damages because Hedren is primarily a film actress. Thus, Allen's essential complaint concerning Hedren's lost earnings damages goes to Grager's testimony rather than Formuzis's. Allen objected to Formuzis's testimony by way of a motion in limine,and objected to Grager's opinion about Hedren's lost earnings during her direct examination at trial on the grounds it was speculative and lacked foundation. The court overruled those objections.

We review any ruling by the trial court on the admissibility of evidence for abuse of discretion. (*Saxena v. Goffney* (2008) 159 Cal.App.4th 316, 332.) A trial court abuses its discretion only when its ruling exceeds the bounds of reason, all circumstances being considered. (*Ibid.*)

We find no abuse of discretion in the court's admission of Grager's opinion testimony upon which Formuzis based his calculations of Hedren's lost earnings. Grager's overall testimony established that she was qualified as an expert. She testified

---

10    Allen also attributes this opinion to Hedren's counsel.

21

that she was a theatrical talent agent and agency owner who specialized in representing very young and senior actors, and was "the only agency in the Hollywood market that [has] that particular clientele." In addition to Hedren, she represented Rip Taylor, Carol Channing, and other senior citizen actors. She testified: "[I]t is my forte to know the roles that are available for the senior market and generally over the years, those roles . . . are pretty substantial, but more so in the last two to three years in Hollywood. . . . I have really tailored my agency in that direction to be able to focus and concentrate on all the extra work that is coming in these days, more so based on the . . . senior age category and name recognition of star talents." Her ensuing testimony revealed her extensive knowledge of the Hollywood film and television industry and market for senior actors, and showed that she was qualified to render an opinion as to Hedren's earning potential as an actress over the eight and one-half-year-period following the trial.

Regarding Allen's objection to Grager's opinions as being speculative and lacking foundation, we note that "[o]nce it is established that a witness has adequate credentials to qualify as an expert, questions as to the degree of his or her expertise go to weight not admissibility." (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1120-1121.) "Any flaws in an expert's opinion may be exposed through the adversary's own evidence or in cross-examination. Those imperfections do not make the expert's sources so unreliable or speculative as to lead to rejection. So long as foundational reliability is met, the strength of an expert's assumptions affects the weight rather than the admissibility of the opinion." (*Id.* at p. 1121.) Based on her experience expertise in obtaining work for Hollywood "legends" like Hedren, Grager was qualified to render an

22

opinion as to the amount of work she could likely obtain for Hedren in the coming decade, and how much work Hedren would likely be forced to forego as a result of her headache condition. Any flaw in Grager's opinion, such as the inherent uncertainty of obtaining future work that most people in the entertainment industry face, goes to the weight of her testimony rather than its admissibility.

Because we find no abuse of discretion in admission of Grager's opinion testimony, we conclude it was well within the court's discretion to admit Formuzis's expert testimony regarding the dollar amount of Hedren's lost future earnings and earning capacity, based on Grager's testimony. Accordingly, the court did not err in instructing the jury that it could award such damages.[11]

## V. *Total Award of Damages*

Allen contends the jury's total award of damages in the amount of $1,483,708.00 is excessive as a matter of law. He reiterates that the evidence supporting the award of damages for lost earnings and lost earning capacity was speculative, and contends the award of $170,000 for future medical expenses was also speculative because it represents the cost of bilateral rhizotomy treatments, which Dr. Fuller testified would have to be repeated every year even though Hedren had not yet undergone that treatment.[12] Finally,

---

[11] The special verdict form did not distinguish between future lost earnings and earning capacity; it directed the jury to determine the amount of future "[l]ost earnings/earning capacity" as a single item of damages.

[12] A rhizotomy is a heat treatment for pain involving use of a radio frequency needle to clip small branch nerves to prevent them from transmitting pain signals. Dr. Fuller answered affirmatively when Hedren's counsel's asked, "And basically in very layman's

23

he contends the jury's award of $660,000 for pain and suffering exceeds the bounds of reason.[13]

"Civil Code section 3283 states in part that '[d]amages may be awarded . . . for detriment . . . certain to result in the future.' Courts have interpreted this to mean that a plaintiff may recover if the detriment is 'reasonably certain' to occur. [Citations.] It is for the jury to determine the probabilities as to whether future detriment is reasonably certain to occur in any particular case." (*Garcia v. Duro Dyne Corp.* (2007) 156 Cal.App.4th 92, 97.) "There is no requirement that a plaintiff prove with certainty the extent of the harm he [or she] has suffered as a result of the defendant's conduct. [Citation.] Although ' "[i]t is desirable . . . that there be definiteness of proof of the amount of damage as far as is reasonably possible [,] [i]t is even more desirable . . . that an injured person not be deprived of substantial compensation merely because he [or she] cannot prove with complete certainty the extent of harm he [or she] has suffered." ' " (*Id.* at pp. 98-99.)

"The power of an appellate court to review the trier of fact's determination of damages is severely circumscribed. An appellate court may interfere with that determination only where the sum awarded is so disproportionate to the evidence as to

terms you're sort of burning away the nerves so that . . . the message doesn't jump anymore?"

13    In his opening brief, Allen inadvertently reversed the jury's awards of economic and noneconomic damages, erroneously referring to the award of economic damages as being $660,000 and the award of noneconomic damages as being $800,000. As noted, the jury awarded noneconomic damages in the total amount of $660,000, consisting of $300,000 for past noneconomic loss, including physical pain and mental suffering, and $360,000 for future noneconomic loss, including physical pain and mental suffering. The jury's total award of past and future economic losses was $823,708.

suggest that the verdict was the result of passion, prejudice or corruption [citations] or where the award is so out of proportion to the evidence that it shocks the conscience of the appellate court." (*Uva v. Evans* (1978) 83 Cal.App.3d 356, 363-364.)

Allen relies on *Scognamillo v. Herrick* (2003) 106 Cal.App.4th 1139, in arguing that the evidence Hedren will have to undergo two rhizotomy treatments annually to treat her chronic headaches is too speculative to support the jury's award of future medical expenses. In *Scognamillo*, the trial court in a default judgment awarded the plaintiff damages for a second back surgery that possibly would be unnecessary, depending on the result of a first surgery. The *Scognamillo* court concluded the testimony regarding the necessity of the second surgery "could hardly have been couched in more speculative terms" because that testimony indicated "one surgery might sufficiently alleviate plaintiff's problems, or that a second surgery might be deemed to not be worth the risk." (*Id.* at p. 1151.) The *Scognamillo* court concluded "the trial court did not have before it sufficient evidence, based on a reasonable medical probability, to [award medical expenses related to a second surgery]." (*Ibid.*)

*Scognamillo* is inapposite. Here, there was substantial evidence that Hedren would continue to suffer from chronic cervicogenic headaches and that rhizotomies would provide relief from the pain she was suffering. The jury was entitled to believe Hedren's testimony that her headaches had continued from the time of the accident in June 2006 to the present. Dr. Fuller testified that Hedren underwent nerve-block injections that established that she was a candidate for rhizotomies, and that a rhizotomy can provide long lasting relief from upper cervical pain. He recommended Hedren

25

undergo that treatment, stating: "[W]e anticipate getting [Hedren] excellent relief with the rhizotomy . . . ." He explained, however, that a rhizotomy would have to be repeated at 12-month intervals at a cost of about $20,000 each year because the clipped branch nerves regenerate over time. Based on Hedren's and Dr. Fuller's testimony, the jury could reasonably find that Hedren's severe chronic headache condition was reasonably certain to continue and that Hedren would have to undergo rhizotomy treatments to obtain relief.

In considering whether the noneconomic damages awarded to Hedren are excessive, we are mindful that " 'a reviewing court must give considerable deference in matters relating to damages to the jury in the first instance and to the trial court secondarily.' " (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1067. The trial court's denial of a motion for new trial on the ground of excessive damages is entitled to deference on appeal because the trial judge was present at the trial and was necessarily more familiar with the evidence. (*Ibid.*)

In denying Allen's motion for new trial on the ground of excessive damages, the trial court correctly stated that "with regard to non-economic damages including pain and suffering, what is reasonable and proper compensation 'is a matter on which there legitimately may be a wide difference of opinion.' " (Citing *Roedder v. Rowley* (1946) 28 Cal.2d 820, 823.) The court concluded the jury's award did not fall "outside this necessarily broad range[,]" noting there was "testimony that . . . Hedren suffers frequent and debilitating headaches which may continue indefinitely." According due deference to jury's award and the trial court's assessment of the award in ruling on the motion for new trial, and considering the substantial evidence in the record that as a result of the

26

subject accident Hedren has suffered daily from severe headaches that limit her ability to take acting work and will require her to undergo invasive rhizotomy treatments to obtain relief from the pain, we cannot say the award of noneconomic damages is so disproportionate to the evidence that it shocks the conscience and suggests passion or prejudice on the part of the jury.

DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

NARES, J.

27